UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT GOODMAN, | ) | CIV.  05-5002-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING THE |
| JO ANNE B. BARNHART, | ) | COMMISSIONER'S |
| Commissioner, Social Security | ) | DECISION |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Robert Goodman, was found to be disabled as of July 18,

2000.  Goodman alleges that he became disabled on January 1, 1995, and

moves the court for a reversal of the Commissioner of Social Security's

decision that he was not disabled until July 18, 2000.  The Commissioner

concedes that Goodman was disabled as of April 27, 2000, but otherwise

opposes Goodman's motion.  The court reverses and remands the

Commissioner's decision.

**PROCEDURAL BACKGROUND**

Goodman applied for disability insurance benefits and Supplemental

Security Income (SSI) under Titles II and XVI of the Social Security Act on

January 27, 1997.  He alleged that he was unable to work because of carpal

tunnel syndrome, limited eyesight in one eye, and an injury suffered as a

toddler.  He alleged he became disabled on December 3, 1996.  On March 18,

1998, an administrative law judge (ALJ) issued an unfavorable decision.  The ALJ found that Goodman had not engaged in substantial gainful activity (SGA) since December 3, 1996, and that Goodman probably had carpal tunnel syndrome and a right eye injury.  The ALJ, however, found that his impairments did not limit his ability to work.  Thus, the ALJ found that Goodman was not disabled.  Goodman did not appeal the ALJ's decision, so it became the final decision of the Commissioner.  (Tr. 64-65, 84-86, 101).

Goodman filed his second application for benefits on July 16, 1998.  He alleged that he became disabled on December 3, 1996, due to carpal tunnel syndrome, arthritis, and a disk problem in his neck.  On April 26, 2000, following an administrative hearing in which Goodman was represented by counsel, the ALJ found that Goodman was not disabled.  The ALJ concluded that administrative res judicata precluded consideration of disability prior to March 19, 1998.  The ALJ found that Goodman had not engaged in SGA since December 10, 1996.  Goodman had the following severe impairments:  carpal tunnel syndrome and a herniated cervical disk.  Goodman had been diagnosed with adjustment disorder with depression, but the ALJ did not find this to be a severe impairment.  The ALJ determined that Goodman had the residual functional capacity (RFC) for medium work  (Tr. 180-82 ,188, 321, 328-30).

Goodman appealed the decision to the Appeals Council.  Before the Appeals Council could reach a decision on his second claim, Goodman filed a third application for benefits on July 6, 2000.  In this application he alleged disabling chronic pain, carpal tunnel syndrome, disk disease, and memory problems, with an alleged disability onset date of January 1, 1995. Goodman's third claim was initially denied on December 21, 2000, based on the conclusion that alcoholism caused his health problems.  (Tr. 336-38, 409-11, 441).

On June 11, 2001, at the reconsideration stage of his third application, Goodman was found disabled.  He was awarded benefits dating to April 27, 2000, which is the day after the ALJ found that Goodman was not disabled in his second application for benefits.  Goodman had been diagnosed with anxiety related disordersand substance abuse as a secondary diagnosis.  At this point, the denial of his second application was still pending review by the Appeals Council.  (Tr. 335, 343, 369).

On June 5, 2002, the Appeals Council remanded the second claim to the ALJ for further review in light of the favorable decision in his third claim and new evidence from Goodman's treating psychiatrist that Goodman suffered from several mental disorders.  The Appeals Council also remanded the decision because evidence of Goodman's mental impairments and

3

evidence that his pain symptoms were related to cervical radiculopathy[1] (rather than just carpal tunnel syndrome) could have been relevant to the time period prior to March 19, 1998, which is the day after the ALJ denied benefits in Goodman's first application.  In denying his first application, the ALJ found that Goodman's carpal tunnel syndrome was not a severe impairment.  The Appeals Council ordered the ALJ to offer Goodman the chance to submit more evidence, obtain evidence from a medical expert to clarify what inferences could be drawn about Goodman's condition before April 27, 2000, and further consider whether res judicata applies to the case for the period prior to March 19, 1998.  (Tr. 370-72).

On remand, the ALJ found that Goodman was disabled as of July 18, 2000.  The Appeals Council then denied Goodman's request for review, making it the final decision of the Commissioner.  This decision, dated February 24, 2004, is now before the court.  Goodman alleges that he became disabled on December 3, 1996, and moves the court to reverse the Commissioner of Social Security's decision that he was not disabled until July 18, 2000.  The Commissioner concedes that Goodman was entitled to benefits as of April 27, 2000, but otherwise opposes Goodman's motion.  (Tr. 17, 40, 180; Def. Br. at 16).

---

[1]Radiculopathy is a pathological condition of the nerve roots.  Merriam Webster Medical Dictionary, available at www.intelihealth.com (2004).

## FACTS

Robert Goodman was born on October 9, 1962, and grew up in Illinois. Among other medical problems, the right side of Goodman's head is much larger than the left side due to a congenital skull defect.  Goodman has headaches and double vision related to the skull defect and an injury to his right eye that he suffered as an eight year old.  (Tr. 87, 118, 152-55).

 Goodman received a GED in 1983.  He has worked as a forklift driver, painter, sandblaster, materials handler, and laborer.  As a materials handler Goodman loaded boxes at a Sears warehouse from July of 1994 to July 9, 1995.  This was apparently his last SGA.  (Tr. 94, 118, 126, 422).

The medical record dates to May 27, 1986, when Goodman was admitted to the St. Joseph Regional Medical Center of Northern Oklahoma and examined by Dr. Weidner.  Goodman reported a long history of drug abuse.  Dr. Weidner noted that Goodman "freely admits hearing voices and seeing things."  Goodman's sister wanted him committed to an institution. Dr. Weidner reported that Goodman "is violent here" and had been hitting trees in the parking lot with his fists.  Goodman threatened Dr. Weidner and the nurses with violence.  Dr. Weidner noted "psychotic patient" as his diagnostic impression.  Goodman's sister wanted to drive him to the Eastern State Hospital in Vinita, Oklahoma, but Goodman was transported in a sheriff's vehicle instead.  (Tr. 576, 594).

Goodman stayed at Eastern State Hospital until June 3, 1986.  His chief complaint, in his own words, was "none."  Goodman reported that four years before this incident, he tried to hang himself and saw a psychiatrist for depression.  During his Eastern State Hospital treatment, Goodman was friendly, cooperative, and socialized well with staff and his peers.  Goodman admitted that he heard voices but denied hallucinations, depression, or suicidal thoughts.  He was drinking a fifth of whiskey per day, but tested negative for illegal drugs.  Dr. C.B. Pinkerton, a staff psychiatrist, diagnosed Goodman with alcohol abuse, episodic, and prescribed Librium for alcohol withdrawal.  Goodman's condition on discharge was good and his prognosis was fair.  There is no evidence of any further medical treatment in the record until 1997.  (Tr. 594-96).

 On January 24, 1997, he reported to the Riverside Medical Center in Kankakee, Illinois, complaining of pain in his left wrist and forearm. Goodman stated that he had fallen on his elbow a month before the visit and that the pain had been getting worse.  Dr. Charles F. Martin gave Goodman a splint and ibuprofen and suggested that he follow up with his own doctor to rule out carpal tunnel syndrome.  (Tr. 149-50).

Goodman saw Dr. Man H. Lee on March 14, 1997, for a 30-minute social security benefits evaluation.  Goodman complained of pain and numbness in his wrist and double vision and headaches related to his eye and

skull problems.  His appearance, thought process, and cognitive function appeared normal.  Goodman was able to lift 28 pounds without any difficulty. Dr. Lee diagnosed carpal tunnel syndrome, and suggested that Goodman take Motrin as needed and use a splint.  (Tr. 152-54).

On May 1, 1997, Goodman saw Naresh C. Chandan, D.O., for another evaluation of his carpal tunnel symptoms.  Dr. Chandan diagnosed probable carpal tunnel syndrome and suggested that Goodman continue using the splint until further neurological testing could be done.  (Tr. 157-59).

On April 2, 1998, Goodman saw Dr. Michael A. Sergeant, a neurologist. Goodman appeared to be suffering from an alcohol-related tremor, headaches and body aches, and possible carpal tunnel syndrome or ulnar neuropathy.[2] Dr. Sergeant recommended Limbitrol,[3] splints, and an EMG for Goodman's wrist problems.  The EMG was negative, but further nerve testing suggested carpal tunnel syndrome.  (229-32).

Goodman saw Dr. Tamerla Chavis on May 27, 1998, and complained of lower back pain, neck pain, headaches, and tingling in his legs.  Goodman reported that carpal tunnel syndrome prevented him from working. Dr. Chavis noted that he appeared "tremulous, and says that this is an old

_____

[2]Neuropathy is "an abnormal and usually degenerative state of the nervous system or nerves."  Merriam Webster Medical Dictionary, available at www.intelihealth.com (2002).  "Ulnar" refers to the forearm area.  Id.

[3]Limbitrol is prescribed for anxiety or panic disorder.  See www.rxlist.com (2004).

finding.  He is not agitated."  Goodman had limited cervical motion due to

discomfort, and diminished motor strength on the right secondary to

diminished effort.  His gait was stiffened.  During the examination, Goodman

wore sunglasses for photophobia.  Dr. Chavis recommended that Goodman

have an MRI and x-rays of his cervical spine.  These tests revealed marked

disk space narrowing and prominent degenerative changes in the cervical

spine, and a prominently bulging disk.  (Tr. 230, 234).

Goodman saw Dr. Lee again on November 24, 1998, for another social

security benefits evaluation.  Goodman complained of carpal tunnel

syndrome, neck pain, headaches, and leg pain.  He reported that he smoked a

pack of cigarettes per day and occasionally drank alcohol.  Goodman reported

that he previously used marijuana, acid, and crack cocaine, but that he

stopped in 1980.  Goodman was oriented to time and place with no acute

physical distress.  His appearance was normal and hygiene was reasonable.

Goodman's thought process and cognitive function were within normal limits.

Dr. Lee diagnosed bilateral carpal tunnel syndrome, probable cervical

radiculopathy, headache, right eye lateral rectus paralysis, and leg pain.  (Tr.

243-45).

On December 3, 1998, Goodman saw Erwin J. Baukus, Ph.D., for a 60-

minute psychological evaluation.  His appearance was normal except for the

mirrored sunglasses he wore during the interview.  Goodman's wife drove him

to the office.  Goodman reported that he had never had any psychiatric

treatment except for the time he was hospitalized "somewhere between

Oklahoma and Missouri."  He reported that he had taken Librium,[4] but that

he stopped because it was expensive and did not help.  Goodman complained

of difficulty sleeping, decreased energy, feelings of guilt and worthlessness,

and difficulty concentrating and thinking.  He had no social activities, except

visits with his brother and his sister-in-law.  Dr. Baukus noted that

Goodman's "range of interests are restricted to sitting looking at the wall, a

little TV, and a little radio."  Goodman felt that he got along well with family

members, neighbors, and friends.  (Tr. 248-49).

Dr. Baukus reported that Goodman had the ability to maintain

appropriate social behavior and that he demonstrated appropriate behavior

during the exam.  His affect was stable.  Goodman's mood was neither

depressed nor elevated.  Goodman was alert and his conversation was not

preoccupied.  "There was no evidence of ego alien hallucinations or delusions

elicited during the [evaluation]."  Dr. Baukus diagnosed adjustment disorder

with depression reactive to his physical problems.  (Tr. 249-50).

In December of 1998 and January of 1999, state agency consultants

reviewed Goodman's records and concluded that his physical and mental

_____

[4]Librium is prescribed to patients with anxiety or panic disorder.  <u>See</u>
www.rxlist.com (2004).

limitations would not prevent him from performing medium work.  (Tr. 252-53, 261, 267).

Dr. Sergeant referred Goodman to Dr. Michel H. Milek, a neurosurgeon. Dr. Milek examined Goodman on November 10, 1999, and opined that he had radiculopathy in the neck from cervical degenerative spine disease, possibly associated with mild carpal tunnel syndrome.  He suggested a CT myelogram[5] to rule out pressure on the nerve root.  Dr. Milek believed Goodman's carpal tunnel syndrome was mild, and that surgery was not necessary.  (Tr. 289-90).

The CT myelogram showed evidence of disk osteophyte complex[6] on the right side of Goodman's C6-C7 vertebra.  Dr. Milek reported that it did not correlate with Goodman's symptoms.  He recommended continued conservative treatment, an epidural injection, and therapy with traction.  (Tr. 284).

Goodman returned to Dr. Chavis for a consultation on August 17, 1999. He complained of weakness in his legs and pain in his knees and lower back. He reported that his lower legs became swollen and bluish.  On physical examination, there was "some suggestion of decreased cooperation by the

---

[5]A myelogram is a radiograph of the spinal cord made by myelography, which is a visualization made after injection of a contrast medium into the area near the spinal cord.  See Merriam Webster Medical Dictionary, available at www.intelihealth.com (2002).

[6]An osteophyte is "a pathological bony outgrowth."  Merriam Webster Medical Dictionary, available at www.intelihealth.com (2002).

patient." Dr. Chavis noted evidence of weakness in the legs.  Dr. Chavis recommended an MRI of the lumbar spine to rule out any significant abnormality.  The MRI showed prominent posterior degenerative change with stenosis (narrowing) at the L3-L4 level of Goodman's spine, and less serious degenerative changes at several other levels.  It also revealed a bulging disk. (Tr. 303, 309).

On July 18, 2000, saw Dr. R.P. Renka, for a psychiatric evaluation. Dr. Renka noted that Goodman "is having considerable coping difficulty and is presently disabled from most meaningful forms of work and social intercourse."  His mood was depressed, and he reported times of significant depression lasting weeks at a time, with occasional crying spells.  Goodman reported that he could not tolerate being around other people, and always made sure that he worked alone in previous jobs.  He felt that people at work were staring at his skull deformity.  Goodman stated that he always had trouble with management because he believed "they were trying to swindle him out of his earnings in some fashion."  (Tr. 353-54).

Goodman reported symptoms of panic attacks since childhood, and that he had to run away from wherever he was when he had an attack.  At the time of the evaluation, he was having daily panic attacks, which he minimized by staying home.  Goodman would not go to restaurants with family members because he felt he had to avoid people.  Goodman reported seeing fleeting

11

images of people since childhood, including a "woman with dark hair and a white face who 'comes to him.'"  When this happens, Goodman would rush away from wherever he was.  Goodman hears his name being called fairly often, but not in relation to his visual hallucinations. He reported that his brother suffered from schizophrenia and depression.  Goodman was suicidal in his teens, and he tried to hang himself.  He denied that he was currently suicidal, because he had a son.  Dr. Renka noted that he had a mean corpuscular volume of 102.6, which is usually a sign of alcoholism.  (Tr. 354-55).

Dr. Renka diagnosed major depression, chronic; panic disorder with agoraphobia; body dysmorphic disorder; nicotine dependence; alcohol dependence; and polysubstance dependence in remission.  He recommended a trial of Celexa and Risperdal, but prognosis was "guarded due to the chronicity of the patient's psychiatric condition."[7]   Dr. Renka believed that "the effects on his life can be reduced with proper psychiatric treatment."  (Tr. 356-57).

On September 19, 2000, Goodman saw Dr. Renka for a 15-minute medication session.  Goodman stated he was still panicking around people in spite of the medication and he appeared very jittery during the session.

---

[7]Celexa is an anti-depressant and Risperdal is an antipsychotic medication used to treat patients that suffer from delusions, hallucinations, unorganized thought, and hostility.  See www.rxlist.com (2004).

Dr. Renka noted that Goodman may have had a social phobia rather than a true panic disorder.  He increased the dosage of Celexa and Risperdal.  At the next appointment on October 30, 2000, Dr. Goodman noted an "[e]vident failure of Celexa and Risperdal to quell anxiety and improve mood."  He prescribed Serzone[8] instead.  (Tr. 360-61).

Goodman's next medication session with Dr. Renka took place on January 24, 2001.  "He came in looking glum.  He indicates that there has been no change at all on Serzone."  After initially refusing to tell Dr. Renka what his mood was, Goodman rated it a five on a scale of one to ten.  Goodman still had a low energy level and his activities were limited.  He was having trouble sleeping because of the pain.  He complained of ongoing visions in his head, which had been going on since childhood.  Dr. Renka recommended that he increase the dosage of Serzone and return in three months.  (Tr. 359).

On May 1, 2001, Dr. Renka noted "I don't see any difference in Robert."  Serzone had no effect, except to increase his headaches.  Goodman stated that he would have no reason to live if he did not have a son, but denied being suicidal.  Goodman reported that he had been praying to Lucifer.  Dr. Renka prescribed the anti-depressant Wellbutrin and Risperdal to replace the

---

[8]Serzone is an anti-depressant also prescribed for anxiety and to help patients sleep.  See www.rxlist.com (2004).

Serzone.  Goodman stated that he did not think any medication would help him because of the longstanding nature of his symptoms.  Dr. Renka reported that "he may be right [but] we won't give up."  (Tr. 358).

On May 28, 2003, Dr. Renka prepared a retrospective diagnosis of Goodman's mental condition in an attempt to determine the onset date of his disability.  In May of 2003, Goodman was taking 10 mg per day of Zyprexa, with an extra half tablet as needed.  This dosage of Zyprexa is appropriate to treat a psychotic disorder.  Dr. Renka reported that paranoid schizophrenia runs in Goodman's family and there was a strong likelihood that Goodman was afflicted too.  "Paranoid schizophrenics are notorious for hiding their psychotic symptoms, claiming that they have never hallucinated, etc.  Some may actually not hallucinate but are still psychotic because of delusions."  (Tr. 591).

Dr. Renka had no doubt that Goodman was disabled at the time, because he could not hold a job or be out in public.  Dr. Renka did not know when the mental illness reached a level that could be classified as a disability because he did not have third-party reports on Goodman's mental state, and because Goodman "withholds information from me during the sessions and I have never felt that I understood his world well enough."  Dr. Renka opined that "there is a strong likelihood that he has met the criteria for disability for mental reasons since his last work in 1995 and possibly even before that."

14

Dr. Renka noted Goodman's "incomplete hallucinations" since childhood.  He also noted that it was difficult to diagnose Goodman's condition in the absence of clearly defined hallucinations or delusions.  Dr. Renka concluded by noting that "Mr. Goodman has been quite cagey about these symptoms." (Tr. 591-92).

### ALJ DECISION

Applying the five-step evaluation process,[9] the ALJ found Goodman was not disabled as defined by Social Security regulations until July 18, 2000 (the date of his first visit with Dr. Renka).  First, the ALJ found that Goodman had not engaged in SGA since July 18, 2000.  Next the ALJ found that Goodman had the following severe impairments: adjustment disorder, anxiety disorder with agoraphobia, alcohol dependence, and degenerative disk of the cervical spine.  These impairments qualified as presumptively disabling impairments under social security regulations.  At steps four and five, the ALJ found that

---

[9]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

Goodman did not have the RFC to perform his previous work, but did have the capacity to do light work.  The ALJ found Goodman had been disabled since July 18, 2000.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo.  Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a

16

reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). See also Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993). The court must review the Commissioner's decision to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews, 483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289 (8th Cir. 1980). If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. Smith v. Shalala, 987 F.2d at 1374.

## DISCUSSION

Goodman alleges that the ALJ improperly (1) ignored the Appeals Council decision to affirm the state agency's disability finding, (2) failed to identify all of Goodman's severe impairments at step two, rendering the subsequent findings unsupported by substantial evidence, (3) failed to give proper weight to the retrospective diagnosis of his treating psychiatrist, and (4) constructively reopened the 1997 claim. Goodman further alleges that overwhelming evidence supports an immediate award of benefits.

**1.      The Proper Weight Given to the Opinion of a Treating Physician**

Retrospective medical diagnoses constitute relevant evidence of

disability.  Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995).  See also

Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984) (medical evidence of

a claimant's condition subsequent to the expiration of his insured status is

relevant evidence because it may bear upon the severity of his condition

before the expiration of his benefits).  If the treating doctor's retrospective

diagnosis is based upon a medically accepted diagnostic technique, it is

generally entitled to substantial weight.  See Grebenick v. Chater, 121 F.3d

1193, 1199 (8th Cir. 1997).  Medically acceptable evidence includes

observations made during an examination and is not limited to the narrow

strictures of laboratory findings or test results.  Ivy v. Sullivan, 898 F.2d

1045, 1048-49 (5th Cir. 1990).

Pursuant to social security regulations, the ALJ should give more

weight to a treating source "since these sources are likely to be the medical

professional most able to provide a detailed, longitudinal picture of your

medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations."

20 C.F.R. § 404.1527(d)(2).  The ALJ must also consider the length of the

treating relationship, and give more weight to a doctor with the longer treating

18

relationship.  20 C.F.R. § 404.1527(d)(2)(I).  In this case, Dr. Renka had

treated Goodman five times over a ten-month period.  Dr. Baukus, the only

other doctor who performed a psychological examination, treated Goodman

one time.  Because Dr. Renka was a treating source and was more familiar

with Goodman's case, the ALJ should have given Dr. Renka's opinion more

weight than that of the consulting or non-examining sources.

Instead, the ALJ gave Dr. Renka's opinion no weight as to the onset of

disability date.  The ALJ stated:

> Dr. Renka discussed the claimant's reported hallucinations and
> said that he suspected the claimant is paranoid schizophrenic but
> it was a hard diagnosis to make in the absence of clearly defined
> hallucinations or delusions.  He said "Mr. Goodman has been
> quite cagey about these symptoms."  Based upon Dr. Renka's
> qualifying statements as to the claimant's level of cooperation in
> treatment, the undersigned gives no weight to the opinion as to
> the onset of disability date.

(Tr. 34).  An ALJ may reject the opinion of a treating physician if it is

inconsistent with other substantial evidence in the record, or inconsistent

with the physician's own progress notes.  See 20 C.F.R. § 404.1527(d)(4).  See

also Grebenick, 121 F.3d at 1199.  In Grebenick, the claimant's treating

physician submitted a retrospective diagnosis that the claimant was disabled

by multiple sclerosis starting in September of 1982.  Id.  His

contemporaneous treatment notes, however, only described mild symptoms at

the relevant time.  Id.  Thus, the ALJ was free to reject the treating physician's

retrospective opinion regarding the disability onset date.  Id.

19

In this case, the ALJ did not find that Dr. Renka's opinion was inconsistent with other evidence in the record.  He rejected it because of the "qualifying statements as to claimant's level of cooperation in treatment" and because Goodman was "cagey" about his symptoms.  This is not a proper reason to reject the opinion of a treating source, particularly in light of Dr. Renka's subsequent diagnosis of paranoid schizophrenia and his statement that "[p]aranoid schizophrenics are notorious for hiding their psychotic symptoms."  Because Dr. Renka was Goodman's treating psychologist and the opinion was supported by the standard DSM-IV diagnoses, the ALJ should have given the opinion substantial weight.  See Grebenick, 121 F.3d at 1199.  See also 20 C.F.R. § 404.1527(d)(2) (providing "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

Morever, in cases involving alleged mental disorders, the Commissioner must "take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).  This is because "individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate." Id. (citing 20 C.F.R. Pt. 404,

20

Subpt. P., App. 1 § 12.00(E) (1999)).  In this case, the record indicated Goodman minimized his schizophrenic symptoms and avoided contact with other people to prevent anxiety attacks.  Goodman's "caginess" about his symptoms requires the ALJ to give more weight to Dr. Renka's report, not less.  See Hutsell, 259 F.3d at 711.

## 2.     The RFC Finding

Goodman contends that the ALJ's finding that he had the RFC for sedentary work prior to July 18, 2000, is not supported by substantial evidence.  At the supplemental hearing on January 13, 2004, the ALJ elicited testimony from the vocational expert (VE) to establish Goodman's RFC. Hypothetical questions must include the impairments and limitations that the ALJ finds credible.  Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  The ALJ only asked questions about a hypothetical applicant with Goodman's physical limitations.[10]  (Tr. 709-715).  See also Def. Br. at 12, 14. October 21, 2005  The VE testified that someone with Goodman's physical limitations could perform the following sedentary jobs: order clerk, call out clerk, and charge account clerk.  Based on this testimony, the ALJ concluded that Goodman could have worked in one of these jobs prior to July 18, 2000.

---

[10]The ALJ permitted Goodman's attorney to ask the VE about the limitations detailed in Dr. Renka's retrospective analysis.

Although the ALJ did not find Dr. Renka's retrospective diagnosis credible, he did credit the testimony of the psychological expert James D. Simpson, Ed.D., that Goodman suffered from an adjustment disorder with depressive features prior to July 18, 2000.  (Tr. 35).  This was based on the consultative examination performed by Dr. Baukus on December 3, 1998. While this diagnosis by itself is not enough to compel a finding of disability, the ALJ must include all of the claimant's limitations in the hypothetical questions to the VE.  Because the RFC finding only addressed Goodman's physical limitations, and not his psychological limitations, the finding is not supported by substantial evidence.

**CONCLUSION**

Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Goodman' claim for disability benefits under Titles II and XVI of the Social Security Act is reversed.  This matter is remanded for further proceedings consistent with this opinion.

Dated November 4, 2005

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE


22